Randal Jerome Dalavai
14332 Mountain Road
Poway, CA 92064
Email: randaljerome@gmail.com
Tel: (872) 232-0713

Plaintiff, In Pro Se

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RANDAL JEROME DALAVAI, SUCCESSOR IN INTEREST TO 'DECEDENT' GEETHA DALAVAI & SON OF GEETHA DALAVAI** | Case No.: '22CV1992 MMA DDL |
| Plaintiff | **COMPLAINT** |
| V. | **Survivor Action for violation of 42 U.S.C. § 1395dd** |
| **THE REGENTS; THE ELIZABETH HOSPICE; EMIL JASON DALAVAI (Nominal Defendant and Surviving Spouse of Geetha Dalavai); JANE SHERIL DALAVAI (Nominal Defendant, Foreign Citizen, and resident of India, Daughter of Geetha Dalavai); KAREN YVONNE DALAVAI (Nominal Defendant, Foreign Citizen, and resident of U.A.E, Daughter of Geetha Dalavai)** | **Wrongful Death** |
| | **Elder Abuse and Dependent Adult Civil Protection Act (EADACPA)** |
| Defendant(s) | |

1

## **INTRODUCTION**

The Plaintiff Randal Jerome Dalavai, In Pro Se, filed a complaint (Case no: 22-CV-1471-CAB-WVG) against University of California San Diego Health for violation of EMTALA on September 29, 2022, in this court.

The case got dismissed with prejudice due to the following reasons:

1.   Plaintiff Randal Jerome Dalavai lacks standing under Article III to bring action individually.

2.   To cure the defect Plaintiff Randal Jerome Dalavai became a Special Administrator to continue with the action filed under the case no: 22-CV-1471-CAB-WVG until a Personal Representative is appointed.

Randal Jerome Dalavai was granted to be Special Administrator by the Probate court to continue with the action filed under the case no: 22-CV-1471-CAB-WVG.

Hon. Cathy Ann Bencivengo found the case to be in-curable as Plaintiff Randal Jerome lacked standing individually and cannot proceed as Pro Se in the capacity of Special Administrator the Estate of his deceased mother Geetha Dalavai.

Plaintiff has tried and is still trying to find counsel to represent the Estate of his mother, however the Plaintiff is so far unsuccessful. Therefore cannot file this complaint as a Special Administrator or Personal Representative.

Due to Plaintiff's mistake of not knowing that he cannot be a pro se by being a Special Administrator to the Estate of Geetha Dalavai, the Plaintiff is unable to cure the defects and show standing.

Further, Plaintiff is unable to amend the Complaint filed on 29 September 2022 to show Standing under Article III as Successor in Interest, as Plaintiff

2

cannot be acting as Successor in Interest while being Special Administrator to continue with the action filed under the case no: 22-CV-1471-CAB-WVG. The Powers of Special Administrator granted to Plaintiff were specific to the complaint filed under Case no: 22-CV-1471-CAB-WVG.

Plaintiff Randal Jerome Dalavai is filing an affidavit in accordance with Section 377.32.

Section 377.32, however, "does not require that the affidavit be filed as a condition precedent to commencing or continuing the action." *See: Parsons v. Tickner, supra, 31 Cal.App.4th at p. 1523.*

> "Thus, a Section 1983 survival claim may be prosecuted by a successor in interest "[w]here there is no personal representative for the estate" and "if the person purporting to act as a successor in interest satisfies the requirements of California law." *Tatum v. City & County of S.F., 441 F.3d 1090, 1093 n.2 (9th Cir. 2006)*." See: *Raymond v. Martin, Case No.: 1:18-cv-00307 - DAD - JLT, 4 (E.D. Cal. May. 23, 2018)*

Plaintiff Randal Jerome Dalavai can proceed pro se in the capacity of Successor in Interest to his deceased mother, Geetha Dalavai as this was allowed in the following circumstance: "James Raymond seeks to proceed pro se and in forma pauperis in this action as the successor in interest to his deceased son, Augustus Joshua Crawford. Plaintiff asserts officers with the Bakersfield Police Department were pursuing Crawford, who exited his vehicle "and began running from pursuing law enforcement officers in attempting to elude arrest." *(Doc. 1 at 2-3)*. Plaintiff contends Warren Martin became enraged that he could not catch up to Crawford, so he shot Crawford in the back. *(Id. at 2)* Plaintiff asserts the defendants are liable for negligence, assault, battery, and violations of

3

Crawford's civil rights arising under the Fourth and Fourteenth Amendments to the United States Constitution. For the reasons set forth below, Plaintiff's motion to proceed in forma pauperis is granted." *See: Raymond v. Martin, Case No.: 1:18-cv-00307 - DAD - JLT, 4 (E.D. Cal. May 2, 2018).*

Section 377.32 of the California Code of Civil Procedure, in turn, requires a "person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest" file a declaration stating, among other things,

(1)  " no proceeding is now pending in California for administration of the decedent's estate, "

(2)  the declarant is the decedent's successor in interest, and

(3)  "[n]o other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding." *(§ 377.32, subd. (a).)*

Section 377.32, however, "does not require that the affidavit be filed as a condition precedent to commencing or continuing the action." *See: Parsons v. Tickner, supra, 31 Cal.App.4th at p. 1523.* "A cause of action for or against a person is not lost by reason of the person's death but survives subject to the applicable limitations period." *Section 377.20, California Code of Civil Procedure.*

"A litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements:

(1)  that he has been pursuing his rights diligently, and

(2)  that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee*

4

*Indian Tribe v. United States, 136 S. Ct. 750, 755 (2016)* (citation and internal quotation marks omitted); see also *United States v. Kwai Fun Wong, 135 S. Ct. 1625, 1631 (2015)*; *Lozano v. Montoya Alvarez, 572 U.S. 1, 10 (2014); Holland v. Florida, 560 U.S. 631, 649 (2010).*

For example, equitable tolling may be appropriate "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period." *Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 96 (1990). No. 18-328". See: Kevin Rotkiske, V. Paul Klemm, et. al. No. 18-328.*

Plaintiff has also filed a complaint with Office of Inspector General, U.S. Department of Health and Human Services on 14 September 2022 and California Department of Public Health regarding the defendant's violation of EMATALA.

Plaintiff Randal Jerome Dalavai has been pursuing his rights diligently and due to his lack of knowledge made in-curable mistakes that prevented him to amend a defective pleading during statutory period.

"Equitable tolling of the statute of limitations is a defense to all federal statutes of limitations, even those expressly contained within a given cause of action, unless tolling would be inconsistent with the legislative purpose." *See: Ellis v. City of San Diego, 176 F.3d 1183, 1189 n.3 (9th Cir. 1999) (citing Am. Pipe &amp; Constr. Co. v. Utah, 414 U.S. 538, 557 (1974).*

Plaintiff Randal Jerome Dalavai filed his first complaint within the statutory period of two years. Due to extraordinary circumstances that prevented Plaintiff to cure the deficiencies, Plaintiff has no option but to file a new complaint in the capacity of Successor in Interest to 'Decedent' Geetha Dalavai.

Plaintiff respectfully requests this court to apply equitable tolling to the cause of actions under EMTALA. California Government Code section 905.6 exempts The Regents of the University of California from claim-filing provisions of the Tort Claims Act.

University of California campuses and medical centers are subsumed entities of The Regents and not independent legal entities; therefore, service of process on campuses, medical centers, their officials, or other campus or medical center entities is not proper service on The Regents. *(C.C.P. §416.50).*

Consequently, when designating parties in a complaint in a civil action arising from a dispute involving The Regents or any of its subsumed campuses or medical centers, The Regents is the proper party to name as defendant. It is not necessary to name as a defendant the involved campus or medical center in addition to The Regents.

Therefore, Plaintiff Randal Jerome Dalavai names the defendant as "The Regents" instead of "The University of California San Diego Health" as filed in the previous complaint.

Since the rest of the heirs of Geetha Dalavai refuse to join or participate in this suit as plaintiffs, the plaintiff is naming the other heirs as defendants (Nominal Defendants) so that all heirs are before the court in the same action.

Plaintiff further claims that there are no allegations pertaining to the Nominal Defendants in this Complaint and Plaintiff does not allege that the Nominal Defendants engaged in any wrongful conduct or have any responsibility or fault for the underlying claim.

The Nominal Defendants in this complaint are as follows:

    1.    Emil Jason Dalavai (Nominal Defendant and Surviving Spouse of Geetha Dalavai)

2.  Jane Sheril Dalavai (Nominal Defendant, Foreign Citizen, and resident of India, Daughter of Geetha Dalavai)

3.  Karen Yvonne Dalavai (Nominal Defendant Foreign Citizen and resident of U.A.E, Daughter of Geetha Dalavai)

"The second and third Eitel factors, taken together, "require that [the] plaintiff[s] state a claim on which [they] may recover." *PepsiCo, Inc., 238 F. Supp. 2d at 1175.* Notably a "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir. 2007).*

California law permits only one action for wrongful death. *Cross v. Pacific Gas & Elec. Co., 60 Cal.2d 690, 694 (1964).* As a result, all heirs are necessary parties and plaintiffs "have a mandatory duty to join all known omitted heirs" in a single action. *Ruttenberg v. Ruttenberg, 53 Cal.App.4th 801, 808 (1997).* "If an heir refuses to participate in the suit as a plaintiff, he or she may be named as a defendant so that all heirs are before the court in the same action.

An heir named as a defendant in a wrongful death action is, in reality, a Plaintiff." Id. Although identified as a nominal defendant, an heir may recover against the wrongful death action plaintiffs if he or she is not properly joined in the action. *See id.; Cotta v. Robinson, 2014 WL 4249144 at *4 (E.D. Cal. Aug. 27, 2014); Soltero v. City of Bakersfield, 2014 WL 6668799 at *2 (E.D. Cal. Nov. 24, 2014).*

Here, the Third Amended Complaint alleges that the Nominal Defendants are Ana's adult children and that each of them was present at her death. *(Doc. No. 81 at 3-4.)* Plaintiffs further allege that the Nominal Defendants are named as parties as required by *California Code of Civil Procedure section 377.60 and pursuant to the Court's order of November 8, 2018. (Doc. No. 81 at 3-4.)*

7

There are no other allegations pertaining to the Nominal Defendants in the Third Amended Complaint and Plaintiffs do not allege that the Nominal Defendants engaged in any wrongful conduct or have any responsibility or fault for the underlying claim" *See: Calderon v. United States, Case No. 1:17-cv-00040-BAM, 5-6 (E.D. Cal. Mar. 13, 2019).*

## SURVIVOR ACTIONS

The *§377.34 of the California Code of Civil Procedure* statute reads: "Notwithstanding subdivision (a), in an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement."

"The successors-in-interest may bring survival claims to seek compensation for their loved one's pre-death pain and suffering." *See Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014).*

"To determine whether a plaintiff may bring a survivor action, the Ninth Circuit instructs that the Court rely upon *California Code of Civil Procedure Section 377.30 rather than Section 377.60. Hayes, 736 F.3d at 1129.*

In relevant part, *Section 377.30* provides that "[a] cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest ... and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." *Cal. Code Civ. P. § 377.30.* Thus, a *Section 1983* survival claim may be prosecuted by a successor in interest [w]here there is no personal representative for the estate and if the person purporting to act as a successor in interest satisfies the requirements of California law." *Tatum v. City & County of S.F., 441 F.3d 1090, 1093 n.2 (9th Cir. 2006).*" *See: Raymond v. Martin, Case No.: 1:18-cv-*

8

*00307 - DAD - JLT, 3-4 (E.D. Cal. May. 23, 2018).*

Accordingly, the Cause of actions under 42 U.S.C. § 1395dd that survived the death of Geetha Dalavai passed to the decedent's successor in interest, Plaintiff Randal Jerome Dalavai who is entitled to commence the Survivor actions brought in this claim.

## ARTICLE III STANDING

Decedent Geetha Dalavai is injured-in-fact for standing purposes because Plaintiff Randal Jerome Dalavai in the capacity of Successor in Interest to Geetha Dalavai asserts that 'Decedent' Geetha Dalavai's Emergency Medical Condition Worsened (Physical and Personal Harm) causing Wrongful Death that is traceable to the challenged conduct of the defendants, the violation of federal law (EMTALA). This is backed by medical records, autopsy reports, and other documentation. The monetary damages are likely to be redressed by a favorable Judicial decision.

## 28 U.S. Code § 1332 – DIVERSITY OF CITIZENSHIP

Plaintiff respectfully requests this court to assert Jurisdiction in accordance with *28 U.S. Code § 1332(a)(2)* as the two Nominal defendants, daughters of Geetha Dalavai are foreign citizens and reside in foreign countries. The matter in controversy exceeds the sum or value of $75,000.

## 28 USC 1367: SUPPLEMENTAL JURISICTION

For claims or matter under Elder Abuse, and Cause of Actions other than Survivor Actions, The Plaintiff respectfully requests this court to assert Jurisdiction in accordance with *28 USC 1367*: Supplemental jurisdiction.

This is because "California law permits only one action for wrongful death." *See: Cross v. Pacific Gas & Elec. Co., 60 Cal.2d 690, 694 (1964).*

The Plaintiff Randal Jerome Dalavai as Successor in Interest, In Pro Se, brings this civil action for Civil money penalties and Civil Enforcement relief in accordance with **42 U.S.C § 1395dd**, and alleges as follows:

### STATEMENT OF CLAIMS

1.     The cause of action in this case for violation of *42 U.S.C. 1395dd.* According to *42 U.S.C. § 1395dd*, The term ''emergency medical condition'' means—

    (A)    a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

        (i)    placing the health of the individual in serious jeopardy,

        (ii)    serious impairment to bodily functions, or

        (iii)    serious dysfunction of any bodily organ or part;

2.     On September 1, 2020, Decedent Geetha Dalavai was dropped off at the Inland Valley Medical Center Emergency Room in a personal vehicle by her son Randal Dalavai. Geetha Dalavai walked into the Emergency Room to seek medical attention for Shortness of breath.

3.     According to Emergency Department Physician Record: 'Decedent' Geetha Dalavai was seen, evaluated, and examined in serial fashion. The patient was admitted the same day. However, the attending Physician advised that data obtained was a single data point, there is no evidence of Emergency Medical Condition.

4.     The Inland Valley Medical Center Emergency Room and the attending Physicians were fully aware that 'Decedent' Geetha Dalavai was

suffering from severe Rheumatoid Arthritis, and she was taking Humira (adalimumab) which is an immunosuppressant medicine, which has lowered the ability of 'Decedent' Geetha Dalavai's immune system to fight infections and would make an infection worse. The hospital and the attending physicians were in the full knowledge that 'Decedent' Geetha Dalavai's Shortness of Breath, manifested for at least three weeks before she showed up in the Emergency Room. This data that Inland Valley Medical center had indicated that Geetha Dalavai's acute symptoms were of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

> (i)    placing the health of Geetha Dalavai in serious jeopardy,
>
> (ii)   serious impairment to bodily functions, or
>
> (iii)  serious dysfunction of any bodily organ or part;

This is exactly the result we see in the medical records within short time after she was admitted to the hospital.

5.    Because of her history of having severe Rheumatoid Arthritis, it was imperative that the Hospital needed to have Rheumatoid Arthritis specialist on-call to evaluate her condition. As she was taking high risk medication (Humira) prior to coming to the Emergency Room, the risks of infectious diseases were very high. The Inland Valley Medical Center Emergency provided within the staff and facilities available at the hospital, further medical examination and treatment as may be required to transfer 'Decedent' Geetha Dalavai to another medical facility in accordance with *42 U.S.C § 1395dd (c)*.

6.    The term ''stabilized'' means, with respect to an emergency medical condition described in *42 U.S.C § 1395dd (1)(A)*, that no material deterioration of

the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility.

7.    To Stabilize Geetha Dalavai's Emergency Medical Condition (Acute Respiratory Failure with Hypoxia) it was imperative that The Inland Valley Medical Center had to diagnose the underlying disease causing the Emergency Medical Condition (Acute Respiratory Failure with Hypoxia).

8.    Even though Inland Valley Medical center admitted 'Decedent' Geetha Dalavai to provide treatment in the capacity that they had within their facilities, 'Decedent' Geetha Dalavai was admitted as a subterfuge to avoid the requirements as set forth in *42 U.S.C § 1395dd*, because Inland Valley Medical Center did not know the underlying definitive cause for Geetha Dalavai's worsening symptoms and given Geetha Dalavai's medical history and severity of her Rheumatoid Arthritis, Inland Valley Medical Center knew they did not have the Higher Level of Care available at tertiary referral hospital which Geetha Dalavai may require if her symptoms worsen. The tertiary care level is for extremely specialized care over a short or extended period involving complex and advanced equipment, treatment, or procedures, often for severe or life-threatening conditions. The 'assessment' on the medical records the day she checked into Emergency, included Acute Respiratory Failure with Hypoxia. Inland Valley Medical Center admitted Geetha Dalavai with the intent to stabilize her when it did not have the resources to do so, and the admission was in bad faith.

9.    Inland Valley Empire knew about 'Decedent' Geetha Dalavai's Rheumatoid Arthritis and the high-risk medication (Humira) she was taking before she came to the Emergency Room. Inland Valley Empire knew they did not have on-call Rheumatoid Arthritis Specialist and the chances of her condition

getting worse were high. As they did not have a definitive diagnosis to Stabilize her worsening hypoxia (EMC) and she wasn't treated for her underlying disease causing her Emergency Medical Condition (Acute Respiratory Failure with Hypoxia), she ultimately ended up on High Flow Oxygen. The Inland Valley Medical Center admitted her even though they did not have an on-call Rheumatoid Arthritis Specialists and they did not have the capability to Stabilize her Emergency Medical Condition.

10.    "We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach." *Bryant v. Adventist Health System/West, 289 F.3d 1162, 1169 (9th Cir. 2002).*

11.    The Cardiothoracic surgeon stated that the Decedent needed to be transferred to a Higher-Level of Care at which point the case management at Inland Valley Medical Center worked to secure a tertiary center. On September 16, 2020, Decedent, Geetha Dalavai was transferred to Jacobs Medical Center facility at the University of California San Diego Health in accordance with *§ 1395dd (c)* to meet their obligation under *§ 1395dd (b)(1)(B).*

12.    The expectation of transfer to the University of California San Diego Health was to get extremely specialized care over a short or extended period involving complex and advanced equipment, treatment, or procedures, in good faith, to get definitive diagnosis to stabilize her severe or life-threatening Emergency Medical Condition (Acute Respiratory Failure with Hypoxia). On the Discharge Summary, differential diagnosis included Viral Pneumonitis, atypical pneumonia, or interstitial edema or interstitial lung disease. Pulmonology

recommended CT surgery evaluation to get definitive diagnosis. However, upon arrival at University of California San Diego Health, the attending Physician examined 'Decedent' Geetha Dalavai and noted the following: "Objective: I have examined the patient and I concur with the fellow's exam. Assessment and plan reviewed with the fellow. I agree with the fellow's plan as documented.

13.    RA-ILD: would defer to primary team but I think a loner trial of high dose steroid is appropriate at this time, with consideration of second/third line treatment if condition worsens. Agree that it is appropriate to r/u primary or secondary infection/pneumonia.

14.    Lung transplant evaluation: I think it is premature at this time to proceed with evaluation. Would like to have evidence that her worsening is not from acute infection. In addition, patient is too deconditioned and her BMI too high for transplant at this time. Her high dose steroid would potentially be an issue for transplant unless it is for short term use. Will continue to follow patient as needed. I hope that her condition can improve, and we will then consider starting transplant work up."

15.    'Decedent' Geetha Dalavai was very hopeful and open to any treatments including Biopsy. 'Decedent' Geetha Dalavai and her family was hoping to get her a biopsy to get a definitive diagnosis as she got worse very quickly at Inland Valley Medical Center and the Pulmonology (IVMF) recommended her to get a Biopsy. 'Decedent' Geetha Dalavai understood the risks of Biopsy and accepted the risks and got transferred to University of California San Diego Health to get a biopsy.

16.    As explained more fully below, even though the University of California San Diego Health admitted 'Decedent' Geetha Dalavai to provide treatment in the capacity that they had within their facilities, 'Decedent' Geetha

Dalavai was admitted as a subterfuge to avoid the requirements as set forth in *42 U.S.C. 1395dd*.

17.    UCSD Health did not intend to nor attempt to get a definitive diagnosis for her underlying disease so as to Stabilize her worsening hypoxia (EMC), which is the very reason she was transferred for. To Stabilize Geetha Dalavai's Emergency Medical Condition (Acute Respiratory Failure with Hypoxia) it was necessary and imperative that University of California San Diego Health had to diagnose the underlying disease causing the Emergency Medical Condition (Acute Respiratory Failure with Hypoxia).

18.    She wasn't treated for her underlying disease causing her Emergency Medical Condition (Acute Respiratory Failure with Hypoxia). She wasn't treated for Viral Pneumonia which was listed in the differential diagnosis of the Discharge Summary of Inland Valley Medical Center. As a tertiary Hospital, University of California San Diego Health did not provide specialized care over an extended period involving complex and advanced equipment, treatment, or procedures, for Geetha Dalavai's severe or life-threatening conditions.

19.    University of California San Diego Health has the technologies such as Extracorporeal membrane oxygenation (ECMO) which is the highest level of life support for people who are in cardiac or respiratory failure. University of California San Diego Health proudly says on their website, "Our ECMO program has earned the prestigious Extracorporeal Life Support Organization's (ELSO) GOLD Award for Excellence in Life Support. This honor recognizes the UC San Diego Health team's commitment to exceptional patient care."

The most common conditions that may require ECMO are:

- Congenital diaphragmatic hernia (CDH)
- Birth defects of the heart

- Meconium aspiration syndrome (MAS)
- Severe pneumonia
- Severe air leak problems
- Severe high blood pressure in the arteries of the lungs (PPHN)

20.    ECMO is a technology that works outside the body to pump and oxygenate a patient's blood. This allows the overworked heart and lungs to rest and heal while being treated by medical and surgical physicians.

21.    After waiting for more than a week without specialized treatment that Geetha Dalavai was transferred for, Geetha Dalavai's son Plaintiff Randal Jerome Dalavai enquired with the Physicians, why UCSD health is not providing ECMO so as to get Geetha Dalavai prepared for a lung biopsy.

22.    The physicians said that ECMO is a bridge for Lung Transplant candidates who are too sick and since Geetha Dalavai is not a lung transplant candidate, ECMO is not necessary for her. They further said and concluded that Geetha Dalavai's lungs are scarred permanently and cannot be recovered, without any objective evidence. According to them, with Geetha Dalavai's permanently scarred lungs, ECMO would be bridge nowhere.

23.    UCSD Health misrepresented the facts to avoid providing highest level of life support, With Geetha Dalavai being a Medi-Cal patient, the UCSD Health was not legally allowed to charge the patients. These kinds of highly specialized, complex, and advanced equipment are reserved for Patients with Private insurance and Patients who able to pay.

24.    Even though, 'Decedent' Geetha Dalavai's son Plaintiff Randal Jerome Dalavai wanted to pay for this kind of specialized treatment for his beloved mother, this was not possible as Geetha Dalavai was a Medi-Cal patient

and UCSD Health was not allowed by regulations to bill patients with Medicare and Medi-Cal directly bypassing the insurance.

25.    When 'USC,' instead of declining the lung transplant, requested for PFT, Dr. Timothy Fernandes willfully misrepresented the fact as 'Geetha Dalavai was not a Candidate for Lung Transplant at 'USC' because this would allow UCSD Health not to continue to provide treatment to Geetha Dalavai until she able to get transferred to USC.

26.    Congress passed the law, EMTALA *(42 U.S.C. § 1395dd)* to deter Hospitals to dump patients who are not profitable or who cannot pay.

27.    As per *42 U.S.C. § 1395dd(b)(1)*, the hospital must provide within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition or until the patient is transferred to another facility. The only way to Stabilize Geetha Dalavai's Emergency Medical Condition was to treat the underlying disease. UCSD Health did not intend to treat the underlying disease that was causing the Emergency Medical Condition. Therefore, Geetha Dalavai was admitted as a subterfuge to avoid the requirements as set forth in *42 U.S.C. 1395dd.*

28.    "We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach." *Bryant v. Adventist Health System/West, 289 F.3d 1162, 1169 (9th Cir. 2002)*

29.    On 09/22/2020, Kira A. Skavinski, DO noted the following:

"I personally saw and examined this patient with the NP. I have reviewed the note above which reflects our shared decision-making.

Geetha Dalavai is a 63-year-old woman with rheumatoid arthritis transferred for acute hypoxemic respiratory failure due to rapid progression of interstitial lung disease thought to be rheumatoid arthritis associated interstitial lung disease. Now on high flow oxygen. Patient is not eligible for lung transplantation at this time and unlikely able to be able to rehab to a place of eligibility. Pt has a good understanding of her illness. She is very hopeful and open to any treatments. She understands that the medical teams are worried about her illness. Her main complaints are dyspnea rendering her to being bedbound with limited movement in bed, and anxiety related to dyspnea. I personally reviewed the above labs and results. Pt with dyspnea related to end-stage ILD, however is currently full code and requesting everything to be done. In the setting of FULL CODE/FULL CARE, treating her symptoms will be challenging. Can trial very low dose liquid morphine, 2mg PO q4 hours prn pain. Encouraged pt. to continue meditation as possible, would avoid benzos at this time. Will benefit from on-going goals of care discussion and directive approach from the team. All recommendations discussed with primary team. Thank you for your consult."

30.    On 09/22/2020 Amy de Meules, LCSW noted the following: Pt is lying in bed on high flow oxygen. She is able to participate in conversation, however, becomes increasingly short of breath with limited conversation. She shares understanding that doctors are trying medications to improve her breathing. She endorses understanding that they are trying everything that they can, but that there is worry about how sick her lungs are. She shares that she has some anxiety

18

at times with SOB. She uses meditation to try to manage her anxiety. She was having more success at home. She continues to try and will use medication when needed.

31.    On 09/27/2020, Naveen Gupta, MD noted:

"PCCM Goals of Care Had discussion with patient, husband, and son in the room about the patient's progressive respiratory failure from severe ILD. Explained that intubation would be associated with high morbidity/mortality with little chance for extubation given the severe underlying lung disease. The patient expressed clearly that she does not want to be intubated with no chance of coming of the ventilator. Therefore, she will be DNI. Additionally, we discussed the role of CPR/defibrillation in the event of a cardiac arrest, and they agreed to not do these interventions as there would be almost no chance of survival. Therefore, she is DNR. In the meantime, we will continue full treatment and the family is pursuing the option of lung txp at other centers including Cedars and USC. Code status: DNR/DNI, full care."

32.    On October 1, 2020, Dr. Timothy M. Fernandes, M.D., discussed with Decedent, Geetha Dalavai and Plaintiff Randal Dalavai the following:

'Decedent' Geetha Dalavai is not a transplant candidate at UCSD, UCLA, Cedars, and USC. Dr. Fernandes, M.D also said that Decedent's RA-ILD (Rheumatoid arthritis-associated interstitial lung disease) has progressed despite pulse steroids and Cytoxan. She has worsening diffuse alveolar damage and new pneumomediastinum. She remains on a high-flow nasal cannula. Since she has no further options for treatment and she is stuck in the ICU due to high flow oxygen needs, Dr. Timothy M. Fernandes, M.D., recommended that

19

Decedent Geetha Dalavai enroll in hospice and goals of care changed to comfort measures only. In the medical record, Dr. Fernandes, M.D made a note about the discussion details as follows: First I discussed with son and husband dismal prognosis and increasing FiO2 requirement. I have recommended inpatient hospice and do not feel she will survive transport home. They are in agreement with comfort measures only. They wanted me to convey my recommendations for inpatient hospice to the patient. I then meet with Geetha Dalavai and Emil. I told her that we have exhausted all treatment options and that I recommend comfort measures only. She was in agreement and wishes to move rooms. She would like to have her husband stay at bedside and would like son to be able to visit. She has daughters in India and Dubai who are working on visas, but they are unlikely to make it in time. We will stop all labs, glucose checks, and insulin/medications. We will focus on her comfort with opioids as needed for sensation of shortness of breath. She will remain on high flow oxygen but will not titrate to SpO2. She is now DNAR comfort care.

## Violation(s) of 42 U.S.C. § 1395dd, Emergency Medical Treatment and Active Labor Act (EMTALA)

33.     On October 01, 2020, Dr. Timothy M. Fernandes, M.D. informed that 'Decedent' Geetha Dalavai is not a candidate for a Lung transplant at USC and her RA-ILD has progressed. The 'Decedent' Geetha Dalavai was referred to USC for Lung Transplant in hopes of getting a second opinion, but the 'Decedent' Geetha Dalavai was not even evaluated for a lung transplant at USC. University of

California San Diego Health violated **42 U.S.C. 1395dd. (a)** by stopping, preventing, and not providing any further necessary Screening for the Emergency Medical Condition that Decedent Geetha Dalavai had. University of California San Diego Health violated **42 U.S.C. 1395dd. (b)** by not providing any further necessary stabilizing treatment.

34.    Dr. Timothy M. Fernandes, M.D. misrepresented 'Decedent' Geetha Dalavai's condition and other information. The cause of death for 'Decedent' Geetha Dalavai according to autopsy is Community-Acquired Broncho Pneumonia and Ischemic Heart Disease being significant factor.

According to the autopsy, 'Decedent' Geetha Dalavai did not have the underlying disease of RA-ILD that Dr. Timothy M. Fernandes, M.D discussed in the Advance Directive Discussion. 'Decedent' Geetha Dalavai's differential diagnosis included Viral Pneumonia and it was noted on the discharge summary of the Inland Valley Medical Center. 'Decedent' Geetha Dalavai was never treated for the Viral Pneumonia. Without the definitive diagnosis of terminal disease, and not treating the viral Pneumonia, 'Decedent' Geetha still had treatment options available.

35.    On 09/16/2020, the day 'Decedent' Geetha Dalavai was transferred to University of California San Diego Health, Physician, Pearce, Alex Kristine, MD noted: "would like to have evidence that her worsening is not from acute infection." There was no Objective evidence that 'Decedent' Geetha Dalavai's worsening condition is not from an acute infection. The only possible way to get objective evidence was to do a lung biopsy which was recommended by transferring Hospital (IVMF).

36.    The Emergency Medical Condition that 'Decedent' Geetha Dalavai came to the Emergency Room for was not Stabilized. On October 01, 2020, University of California San Diego Health stopped providing **within the staff and**

21

facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition that 'Decedent' Geetha Dalavai came to the Emergency Room for, or for transfer to another medical facility in accordance *42 U.S.C. 1395dd. (c)*.

37.    As of October 01, 2020, *42 U.S.C. 1395dd.* applied to Geetha Dalavai because both Geetha Dalavai walked into the Emergency Room at Inland Valley Medical Center for necessary stabilizing treatment of Emergency Medical Condition. Both Inland valley Medical Center and University of California San Diego Health admitted Geetha Dalavai as a subterfuge to avoid the requirements as set forth in *42 U.S.C § 1395dd*, because from the time Geetha Dalavai entered Emergency Room till October 01, 2020, there was no definitive diagnosis for the underlying cause of the Emergency Medical Condition 'Decedent' Geetha Dalavai had.

38.    University of California San Diego Health did not treat all the diseases that were identified in the differential diagnosis of the transferring Hospital. Even though Pulmonology at Inland Valley Medical Center recommended Lung Biopsy, University of California did not perform the Lung Biopsy.

39.    The Hospital is deemed to have met the requirement of *42 U.S.C § 1395dd (1)(a)* if the hospital offers the individual, further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

40.    University of California San Diego Health did not take any steps to secure the informed consent of Geetha Dalavai or her Health Care Agent Plaintiff Randal Jerome Dalavai and did not inform the Plaintiff Randal Jerome Dalavai or Geetha Dalavai of the risks and benefits to Geetha Dalavai of such examination and treatment.

## Violation of 42 U.S.C. § 1395dd Emergency Medical Treatment and Active Labor Act (EMTALA)

41. The University of California San Diego Health did not meet its obligation under *42 U.S.C. 1395dd.(b)(2)* by not taking any reasonable steps to secure Geetha Dalavai's written informed consent to refuse such examination and treatment that may be available according to *42 U.S.C. 1395dd.* University of California San Diego Health violated *42 U.S.C. 1395dd.(a)* by not providing necessary screening for the emergency medical condition that Geetha Dalavai had when she checked in to the Emergency at Inland Valley Medical Center. University of California San Diego Health violated *42 U.S.C. 1395dd.(b)* by not providing necessary stabilizing treatment for the Emergency Medical Condition that Geetha Dalavai had when she checked in to the Emergency at Inland Valley Medical Center and did not meet its obligation under *§ 1395dd.(C)(2)* by prematurely transferring Geetha Dalavai to Hospice Care which was medically not necessary to 'Decedent' Geetha Dalavai. The University of California San Diego Health did not meet its obligations under *42 U.S.C. 1395dd. (c) (2)* while transferring the patient to Elizabeth Hospice.

## Medical Battery
## Medical Malpractice/ Medical Negligence/ Wrongful Death

42.    Physicians caring for 'Decedent' Geetha Dalavai at UCSD Health, and each of them, established a relationship with Decedent Geetha Dalavai, giving

rise to each Physician's duty to Decedent Geetha to provide skillful management of her health condition. Physicians' fiduciary responsibility to patients entails an obligation to support continuity of care for their patients. At the beginning of patient-physician relationship, the physician should alert the patient to any foreseeable impediments to continuity of care.

43.     Physicians attending 'Decedent' Geetha Dalavai and each of them breached their duty to 'Decedent' Geetha Dalavai to provide skillful management of her health condition, including but not limited to examination, diagnosis, care, and treatment of Decedent.

44.     At all times herein mentioned, The Physicians attending during and after the violation of EMTALA and each of them so negligently and carelessly cared for, treated and rendered medical services upon the person and body of 'Decedent' Geetha Dalavai and so negligently and carelessly operated, managed, controlled and conducted their services, activities and supervision in connection with Decedent's care and treatment that as a direct and proximate result thereof Decedent was caused to and did suffer the fatal injuries herein alleged. During said periods of time herein above alleged, Defendants and each of them, were negligent, careless, and unskillful in their management of the health of Decedent, including but not limited to the examination, diagnosis, care, and treatment that were or should have been provided to her. The negligence of Defendants and each of them, includes but is not limited to the following:

(1)     failing to properly evaluate, diagnose and treat Decedent's serious and life-threatening threatening pulmonary condition;

(2)     failing to order appropriate diagnostic studies to properly diagnose and treat Decedent;

(3)     failing to timely perform appropriate interventions; and,

(4)    failing to otherwise treat her condition in an appropriate manner.

45.    With Comfort care, which includes hospice and palliative care—patients continue to receive medical treatment, but the goal of the treatment shifts from curing the disease to relieving pain and symptoms and allowing death to occur naturally.

46.    Decedent, Geetha Dalavai requested that Comfort care on condition that she does not have any further treatment options available and there is objective evidence that she is terminally ill. However, the physicians transferred her to comfort care without meeting the condition that Decedent has set. Naveen Gupta MD on 09/27/2020, explained decedent that intubation would be associated with high morbidity/mortality with little chance for extubating given the severe underlying lung disease.

47.    The 'Decedent' expressed clearly that she does not want to be intubated only when there is no chance of coming of the ventilator. However, the Physician went ahead and put her on DNI status when there was a chance for the patient coming of the ventilator. This has affected 'Decedent's ability to be accepted for treatment for her life-threatening pulmonary condition from other medical providers or physicians. 'Decedent' needed to be intubated for Biopsy to get proper diagnosis for her underlying disease that was causing life threatening condition.

## False Imprisonment
### Under California Civil Procedure, Section 340(c)

48.    The law does not permit the physician to substitute his own judgment for that of another Physician by any form of artifice or deception. Dr Timothy Fernandes, Physician caring for 'Decedent' Geetha Dalavai at UCSD Health,

25

established a relationship with Decedent Geetha Dalavai, giving rise to Physician's duty to Decedent Geetha to provide skillful management of her health condition. Physicians' fiduciary responsibility to patients entails an obligation to support continuity of care for their patients. At the beginning of patient-physician relationship, the physician should alert the patient to any foreseeable impediments to continuity of care.

49.    Dr. Timothy Fernandes prevented the movement of Geetha Dalavai to another medical facility 'USC' by falsely claiming that 'Decedent' Geetha Dalavai was not a candidate for Lung Transplant. 'Decedent' Geetha Dalavai remained confined to her hospital bed at Jacobs Medical Center at UC San Diego Health and lost the opportunity to receive life-saving treatment at another facility.

### Elder Abuse and Dependent Adult Civil Protection Act (EADACPA) Elder Neglect and Endangerment Welfare & Institution code Section §15610-15610.07 & 15657(b)

50.    Under the California statute, elders refer to persons 65 years and older. However, the Act also applies to adults outside this age range if they are considered dependent adults. Dependent adults include anyone between 18 and 64 who has physical or mental limitations affecting their ability to perform everyday activities or protect their rights. 'Decedent' Geetha Dalavai was born on 22 February 1957. She was disabled dependent due to the fact that she was confined to her bed due to her Medical Condition. She was also legally disabled due to her severe Rheumatoid Arthritis which affected her mobility.

51.    The Hospice has a duty to provide all comfort measures until the patient's death. With Comfort care, which includes hospice and palliative care—patients continue to receive medical treatment, but the goal of the treatment shifts from curing the disease to relieving pain and symptoms and allowing death to

occur naturally. The Elizabeth Hospice is vicariously liable for all the negligence of the medical providers employed by them and caring for Geetha Dalavai.

52.    The discharge instructions to Hospice from UC San Diego Health included Geetha Dalavai to take Lansoprazole due to Geetha Dalavai having gastroesophageal reflux disease. Lansoprazole is a type of medicine called a proton pump inhibitor (PPI). Proton pumps are enzymes in the lining of your stomach that help it make acid to digest food. Lansoprazole prevents proton pumps from working properly. This reduces the amount of acid the stomach makes. PPIs are commonly prescribed to treat gastroesophageal reflux disease (GERD), or heartburn and symptoms are generally well controlled after 60 days of PPI therapy, even when cases are more severe. PPIs are known to cause rebound acid reflux when patients try to abruptly discontinue using the PPI.

53.    The Elizabeth Hospice failed to provide the Lansoprazole to relieve from the symptoms of gastroesophageal reflux disease (GERD) or heartburn. Discontinuation of using the PPI (Lansoprazole), caused rebound acid reflux. The symptoms were very severe on the night of 19 Dec 2020. This has caused Geetha Dalavai to suffer unnecessary extreme pain and suffering by Geetha Dalavai. Plaintiff Randal Jerome Dalavai called the Hospice to immediately provide her with medication. The nurse at the Hospice prescribed the medications and the Plaintiff picked up the medications at the pharmacy. However, the symptoms are not immediately controlled by PPI therapy. The absence of this medication which was supposed to be provided by The Elizabeth Hospice after discharge from UCSD Health amounted to Elder Neglect and Endangerment and violated Elder Abuse and Dependent Adult Civil Protection Act. Plaintiff claims for damages in accordance with *Welfare & Institution code Section §15610.57(a)(b)(c).*

## Wrongful Death
## Civil money penalties and Civil enforcement

54.    As a direct and proximate result of the aforesaid medical battery, negligence, false imprisonment, carelessness and unskillfulness of the Physicians, Elder Neglect and Endangerment, and each of them, the Decedent suffered grave injuries including pain, suffering and ultimately, death. Plaintiff(s) are informed and believe and thereon allege that said death would not have occurred if not for the actions of Physicians and the Defendants. As a further direct and proximate result of the aforesaid medical battery, negligence, false imprisonment, carelessness and unskillfulness, Plaintiffs have suffered, and will in the future continue to suffer pain, loss of enjoyment of life and other forms of severe mental and emotional distress and anguish. Plaintiffs have been deprived of a kind and loving mother and of the Decedent's care, comfort, society, protection, love, companionship, affection, solace, moral support, physical assistance in the operation and maintenance of the home, and financial support. Furthermore, Plaintiffs have incurred financial damages associated therewith. As a further, direct, and legal result of said negligence, carelessness, and unskillfulness of the Defendants, and each of them, Plaintiff is entitled to prejudgment interest under *Code of Civil Procedure §998, and Civil Code §3291.*

55.    As a direct and proximate result of the death of the Decedent, Plaintiffs have incurred reasonable and necessary expenses for the Decedent's funeral, burial, and memorial services to their damage in a presently unascertained sum and which will be established according to proof at trial.

## Intentional Infliction of Emotional Distress

56.    The defendants acted with reckless disregard of the probability that the Plaintiff Randal Jerome Dalavai would suffer emotional distress; The

28

defendants knew that the plaintiff Randal Jerome Dalavai was present when the aforesaid medical battery, negligence, false imprisonment, carelessness and unskillfulness of the Physicians, Elder Neglect and Endangerment, and each of them, caused the Decedent to suffer grave injuries including pain, suffering and ultimately, death to occur; The Plaintiff Randal Jerome Dalavai suffered severe emotional distress; and the defendant's aforesaid medical battery, negligence, false imprisonment, carelessness and unskillfulness of the Physicians, Elder Neglect and Endangerment, and each of them was a substantial factor in causing the plaintiff's severe emotional distress.

## EMTALA Framework
## 42 U.S.C § 1395dd. Examination and treatment for emergency medical conditions and women in labor

57.   (a) Medical screening requirement:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

**(b)   Necessary stabilizing treatment for emergency medical conditions and labor**

29

**(1)**    **In general** If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either— (a) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (b) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

**(2)**    **Refusal to consent to treatment** A hospital is deemed to meet the requirement of paragraph (1)(a) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3)**    **Refusal to consent to transfer** A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) of this section and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual

30

of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c)**     **Restricting transfers until individual stabilized**

**(1)**     **Rule** If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless— **(a)(i) the individual** (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility, **(ii) a physician** (within the meaning of section 1395x(r)(1) of this title) has signed a certification that 1 based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or **(iii) if a physician** is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the

determination described in such clause, and subsequently countersigns the certification; and **(b) the transfer** is an appropriate transfer (within the meaning of paragraph (2)) to that facility. A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2)    **Appropriate transfer** an appropriate transfer to a medical facility is a transfer—

(a)    **in which** the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(b)    **in which** the receiving facility— **(i) has available** space and qualified personnel for the treatment of the individual, and **(ii) has agreed** to accept transfer of the individual and to provide appropriate medical treatment;

(c)    **in which** the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(a), and the name and address of any on-call physician (described in subsection (d)(1)(c) of this section) who has

32

refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(d)** **in which** the transfer is affected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(e)** **which** meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

**(d)** **Enforcement (1) Civil money penalties**

**(a) A participating hospital** that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a–7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a–7a(a) of this title.

**(b)** **Subject to** subparagraph **(c), any physician** who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who— **(i) signs a certification** under subsection (c)(1)(A) of this section that the medical benefits reasonably to be expected from a

33

transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or **(ii) misrepresents an individual's condition or other information**, including a hospital's obligations under this section, is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a–7a of this title (other than the first and second sentences of subsection (a) and subsection (b) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a–7a(a) of this title. (c) If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (b). However, the previous

sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

(2) **Civil enforcement (a) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate. **(b) Financial loss** to other medical facility Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate. **(c) Limitations on actions** No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

(3) **Consultation with peer review organizations** In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate utilization and quality control peer review organization (with a contract under part B of subchapter XI of this chapter) to assess whether the individual involved had an emergency medical condition which had not

35

been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B. (4) Notice upon closing an investigation The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed. (e) Definitions In this section: (1) The term ''emergency medical condition'' means— (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in— (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to

bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (b) with respect to a pregnant woman who is having contractions— (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child. (2) The term ''participating hospital'' means a hospital that has entered into a provider agreement under section 1395cc of this title. (3)(a) The term ''to stabilize'' means, with respect to an emergency medical condition described in paragraph (1)(a), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(b), to deliver (including the placenta). (b) The term ''stabilized'' means, with respect to an emergency medical condition described in paragraph (1)(a), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(b), that the woman has delivered (including the placenta). (4) The term ''transfer'' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or

37

associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (a) has been declared dead, or (b) leaves the facility without the permission of any such person. (5) The term ''hospital'' includes a critical access hospital (as defined in section 1395x(mm)(1) of this title). (f) Preemption The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section. (g) Nondiscrimination A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual. (h) No delay in examination or treatment A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status. (i) Whistleblower protections A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(a)(iii) of this section or a physician because the person or physician refuses to authorize

38

the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## PARTIES

58.    At all times herein mentioned, Randal Dalavai ("Randal Dalavai") was an individual residing in the county of Riverside, California. Randal Dalavai was and is the son of Decedent Geetha Dalavai.

59.    Plaintiff is informed, believes, and based thereon alleges, that the University of California-San Diego Medical Center ("UCSD Medical Center") is a medical facility licensed to do business and doing business in the County of San Diego, California. University of California-San Diego Medical Center ("UCSD Medical Center") is subsumed entity of The Regents and not independent legal entities; Consequently, when designating parties in a complaint in a civil action arising from a dispute involving The Regents or any of its subsumed campuses or medical centers, The Regents is the proper party to name as defendant. It is not necessary to name as a defendant the involved campus or medical center in addition to The Regents.

60.    As the surviving children and husband of Decedent, Plaintiff and Nominal Defendants would be entitled to property of Decedent under the laws of intestate succession. Persons of this degree of kinship would be entitled to the property of the Decedent by intestate succession pursuant to the provisions of Probate Code, sections 6400 et seq.

61.    Plaintiff is informed, believes, and based thereon allege, that all the medical providers who provided medical care and treatment to Decedent at Elizabeth Hospice during the relevant incident were employees of the

"ELIZABETH HOSPICE" and were acting within the course and scope of their respective employments at the time each of them rendered care to Decedent.

62.    The events giving rise to the causes of action alleged herein occurred in the State of California, County of San Diego, and County of Riverside, as that is where defendants do business, and where the relevant incident occurred.

63.    Plaintiffs are informed, believe, and based thereon allege, that all the medical providers who provided medical care and treatment to Decedent at UCSD Health during the relevant incident were employees of the REGENTS and were acting within the course and scope of their respective employments at the time each of them rendered care to Decedent.

**JURISDICTION AND VENUE**

64.    The is a civil action arising under laws of the United States, this court has subject-matter jurisdiction pursuant to *28 U.S. Code § 1331* - Federal question (*Violation 42 U.S.C § 1935dd), 28 U.S.C § 1367*: Supplemental jurisdiction, and *28 U.S. Code § 1332(a)(2)* as the two Nominal defendants, daughters of Geetha Dalavai are foreign citizens and reside in foreign countries. The matter in controversy exceeds the sum or value of $75,000.

**REQUEST FOR RELIEF**

**Wherefore, Plaintiff respectfully requests that this Court:**

a.    Assert jurisdiction over this matter;

b.    Issue a declaratory judgment in favor of Plaintiff;

c.    Enforce objectively verifiable monetary presently unascertained sum, and which will be established according to proof at trial, losses such as but not limited to past and future

medical expenses, loss of past and future earnings per Civil money penalties in accordance with *42 U.S.C. 1395dd. (d)(1);*

d.   Civil enforcement in accordance with *42 U.S.C. 1395dd. (d)(2);*

e.   For legal interest on judgment from the filing of this complaint to the date of judgment.

f.   For any other and further relief as the Court deems just and proper.

g.   Presently unascertained punitive damages for all claims as the Court deems just and proper.

h.   Enforce objectively verifiable monetary, presently unascertained sum and which will be established according to proof at trial, losses such as but not limited to past and future medical expenses, loss of past and future earnings for all personal injury claims in accordance with applicable State laws.

## **DEMAND FOR JURY TRIAL**

Plaintiff is requesting a trial by jury pursuant to FRCP, Rule 38

I declare under penalty of perjury that the foregoing is true and correct.


<u>12/15/2022</u>                      *Randal Dalavai (Dec 15, 2022 13:31 PST)*
**Date**                               **Randal Jerome Dalavai**
                                       **Plaintiff, In Pro Se**